# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|                                                    |     |                          |
|----------------------------------------------------|-----|--------------------------|
| GOLDEN RULE FINANCIAL CORPORATION,                 | )   |                          |
|                                                    | )   |                          |
| Plaintiff,                                         | )   |                          |
|                                                    | )   |                          |
| v.                                                 | )   | C.A. No. 2020-0378-PAF   |
|                                                    | )   |                          |
| SHAREHOLDER REPRESENTATIVE SERVICES LLC,           | )   |                          |
|                                                    | )   |                          |
| Defendant.                                         | )   |                          |

## MEMORANDUM OPINION

Date Submitted: October 30, 2020
Date Decided: January 29, 2021

Michael J. Maimone, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Randall E. Kahnke, Peter C. Magnuson, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, Minnesota; *Attorneys for Plaintiff Golden Rule Financial Corporation.*

David E. Ross, Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Erin C. Johnston, P.C., McClain Thompson, Mariel A. Brookins, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendant Shareholder Representative Services LLC.*

**FIORAVANTI, Vice Chancellor**

This case involves a dispute over the calculation of the final purchase price in a merger agreement. Pursuant to that agreement, Plaintiff Golden Rule Financial Corporation ("Golden Rule" or the "Buyer") acquired USHEALTH Group, Inc. ("USHEALTH" or the "Company") for a base purchase price of $750 million, subject to a post-closing purchase price adjustment. Defendant Shareholder Representative Services LLC ("SRS" or the "Seller") is the representative of the former stockholders of the Company.

The merger agreement contains a dispute resolution mechanism for resolving disagreements over the purchase price adjustment. The Seller initiated the dispute resolution mechanism, and the Buyer filed this action for declaratory and injunctive relief. The Buyer essentially seeks a judicial determination as to the construction and application of the post-closing purchase price adjustment. The Seller has moved to dismiss. This decision grants the Seller's motion.

## I.  BACKGROUND

The following facts are taken from Golden Rule's Verified Complaint (the "Complaint" or "Compl.") and the exhibits incorporated therein.

### A.  The Parties

Plaintiff Golden Rule is a health insurance company organized under the laws of Delaware. Golden Rule is an indirect wholly owned subsidiary of UnitedHealth Group, Incorporated.

2

USHEALTH is a Delaware corporation that owns several insurance companies and other entities.

Defendant SRS is a Colorado limited liability company that acts as the representative agent and attorney-in-fact of the stockholders of the Company in connection with the sale of the Company to Golden Rule.

**B.     The Agreement and Purchase Price Adjustment**

On June 2, 2019, the Buyer and the Seller entered into an Agreement and Plan of Merger (the "Agreement") whereby the Buyer would acquire the Company for a base price of $750 million.[1]  The parties closed the transaction on August 31, 2019.[2]

The Agreement provided for a purchase price adjustment based on whether certain accounting metrics at closing exceeded or fell short of targets established at signing.  This dispute centers on one particular accounting metric:  tangible net worth.  Under the Agreement, "Tangible Net Worth" means "as of the [closing date], the total assets . . . minus the total Liabilities . . . minus the total intangible assets . . . , in each case determined in accordance with the Accounting Principles."[3]  The Agreement also set the target value (the "Tangible Net Worth Minimum") at $52 million.[4]  If the Tangible Net Worth at closing exceeded $52 million, the excess

---

[1] Compl. ¶ 20.

[2] *Id.* ¶ 21.

[3] Agreement § 1.1.

[4] *Id.* (defining "Tangible Net Worth Minimum").

would be added to the purchase price. If the Tangible Net Worth at closing was less than $52 million, the purchase price would be reduced a corresponding amount.

The parties were thus required to determine the Tangible Net Worth at closing to finalize the purchase price. To this end, the Agreement set out a three-step process to accurately discern (or "true-up") the Tangible Net Worth at closing.

First, the Agreement required the Company to generate an estimate of the Company's Tangible Net Worth at closing prepared pursuant to the "Accounting Principles," which are attached as Annex A to the Agreement. Section 3.1(a) states:

> No later than five (5) Business Days prior to the anticipated Closing Date, the Company shall deliver to [the Buyer] a statement setting forth an estimated balance sheet of the Company as of the [closing date] prepared in accordance with the Accounting Principles (the "Estimated Balance Sheet") and a schedule . . . (the "Estimated Schedule") showing, in reasonable detail, a good faith estimate of the Company's calculations of the Tangible Net Worth (the "Estimated Tangible Net Worth") . . . .[5]

The Estimated Balance Sheet and the Estimated Tangible Net Worth would then be used to compute an initial purchase price adjustment (the "Adjusted Initial Amount"), which would be added to (or subtracted from) the base price and would determine the purchase price the Buyer would actually pay at closing.[6]

---

[5] *Id.* § 3.1(a).

[6] Compl. ¶ 28; Agreement § 3.2(a).

4

Second, within 90 days of the closing date, the Agreement required the Buyer

to generate its own calculation of the Tangible Net Worth as of the closing date.

Section 3.4(b) states:

> No later than 90 days after the Closing Date, [the Buyer] shall deliver
> to [the Seller] a statement (the "Final Adjustment Statement") setting
> forth (i) the balance sheet of the Company as of the [closing date]
> prepared in accordance with the Accounting Principles, consistently
> applied (the "Subject Balance Sheet"), and (ii) [the Buyer's] good faith
> calculation of (A) the Tangible Net Worth . . . .[7]

Like the Company, the Buyer was required to prepare its calculations pursuant to the

Accounting Principles. Through these computations, the Buyer was to determine

what the final purchase price adjustment should be.

Third, the Agreement included a dispute resolution procedure to resolve any

disagreement over the final purchase price adjustment. In the event that the Seller

disagreed with any amount in the Buyer's Final Adjustment Statement, the Seller

was to deliver a dispute notice to the Buyer.[8] The parties agreed that, for 30 days

after delivery of a dispute notice, they would endeavor in good faith to resolve the

dispute. If they were unable to resolve the dispute within 30 days, the parties agreed

to engage an independent accounting firm to make a determination regarding all

---

[7] Agreement § 3.4(b).

[8] *Id.* § 3.4(b)(ii).

matters remaining in dispute.[9]  The independent accounting firm was to consider the parties' submissions and then determine what adjustments should be made to the computations at issue, based on "the principles of this Section 3.4 and the terms of this Agreement."[10]  The independent accounting firm's binding adjustments would be incorporated into the "Final Balance Sheet," from which the Tangible Net Worth and the final purchase price adjustment (the "Final Adjustment Amount") would be derived.[11]

To true-up the adjusted purchase price, the Final Adjustment Amount was compared to the Adjusted Initial Amount that the Seller generated pre-closing.  If the Final Adjustment Amount exceeded the Adjusted Initial Amount, the Buyer would owe the Seller the difference.  Conversely, if the Final Adjustment Amount was less than the Adjusted Initial Amount, the Buyer was entitled to reimbursement of the difference from the Seller.[12]

Section 3.5 states that

[a]ll of the amounts set forth on the Estimated Schedule and the Final Adjustment Statement (and the individual elements included therein for

---

[9] The parties designated KPMG LLP as the independent accounting firm of first resort.  *Id.* § 3.4(b)(iv).  According to the Agreement, the independent accounting firm "shall act as an expert, not an arbitrator," and it "shall not be permitted to engage in independent fact-finding discovery or conduct depositions or undertake similar interrogatory actions of the type that would be performed by an arbitrator rather than an expert."  *Id.*

[10] Agreement § 3.4(b)(vi).

[11] *Id.* § 3.4(b)(viii).

[12] *Id.* § 3.4(a).

the calculation of the Adjusted Initial Amount or the Final Adjustment Amount, as applicable) shall (a) be prepared in accordance with the Accounting Principles . . . .[13]

## C.    Accounting Principles and ASC 606

Central to the purchase price adjustment, and to this dispute, are the Accounting Principles, which are contained in a two-page annex to the Agreement. The first paragraph requires that the "Closing Balance Sheets" (*i.e.*, the Estimated Balance Sheet, Subject Balance Sheet, and Final Balance Sheet)[14] and the Tangible Net Worth be prepared and calculated according to a three-tiered hierarchy.

> The Closing Balance Sheets, Operating Cash and Tangible Net Worth shall be prepared and calculated in accordance with the hierarchy outlined below:
>
> (a) the accounting principles and policies specifically set out below (the "Specific Policies");
>
> (b) to the extent not addressed in paragraph (a) and not inconsistent with GAAP, as applicable, the accounting policies, principles, procedures, rules, practices, methodologies, categorizations, and definitions used to prepare the audited GAAP annual consolidated balance sheet as at December 31, 2018 . . . ;
>
> (c) to the extent not addressed in paragraphs (a) and (b), GAAP, as applicable.
>
> For the avoidance of doubt, paragraph (a) shall take precedence over paragraphs (b) and (c); paragraph (b) shall take precedence over paragraphs (c).[15]

---

[13] *Id.* § 3.5.

[14] *Id.* § 1.1 (defining "Closing Balance Sheets").

[15] Agreement, Annex A [the "Accounting Principles"] ¶ 1.

The first Specific Policy is the special accounting standard at issue in this dispute. It reads: "The Closing Balance Sheets and Tangible Net Worth will reflect the impact of the requirements of GAAP accounting standard ASU 2014-09, 'Revenue from Contracts with Customers (Topic 606).'"[16] This standard, which this Opinion will refer to as "ASC 606," is a relatively new accounting standard promulgated by the Financial Accounting Standards Board that changed how and when a company may recognize revenue from long-term customer contracts.[17] Private companies, such as the Company, were not required to adopt ASC 606 until the annual reporting period ending December 31, 2019, which meant that the Company was not required to implement ASC 606 in its financial statements during negotiations or prior to closing.[18]

According to the Buyer, the Seller proposed that the parties apply ASC 606 for purposes of the true-up process, and the Buyer agreed to include ASC 606 in the Accounting Principles.[19] The Seller allegedly made that proposal because ASC 606 was already reflected in the Company's financial statements that the Buyer was

---

[16] *Id.* ¶ 5.

[17] Compl. ¶ 37.

[18] *Id.* ¶ 38; Pl. Ans. Br. 11.

[19] Compl. ¶ 42. The Seller alleges that it was the Buyer who insisted on having ASC 606 included in the Accounting Principles. *Id.* Ex. C at 2. This disputed fact does not affect this Opinion's analysis.

8

relying on during negotiations.[20] As evidence of this early adoption, the Seller provided to the Buyer certain financial statements for the four-month period ending April 30, 2019 (the "2019 Interim Financial Statements"), which included a line item titled "Cumulative adjustment for net unearned revenue."[21] The Buyer understood the line item to indicate that the Company had already adopted ASC 606. Furthermore, the Seller provided the Buyer with a memorandum stating that ASC 606 "became effective for [the Company] and its subsidiaries on January 1, 2019."[22] The Seller represented to the Buyer multiple times, including in a memorandum, that the Seller did not expect adoption of ASC 606 to have a material impact on the Company's financial statements.[23] The Buyer alleges that it relied on these representations in establishing the Tangible Net Worth Minimum at signing.[24]

### D.     Closing and True-Up

Prior to closing, the Seller prepared the Estimated Balance Sheet, as required by Section 3.1(a). The Seller calculated the Estimated Tangible Net Worth to be

---

[20] Compl. ¶ 42.

[21] *Id.* ¶ 47.

[22] *Id.* ¶ 48.

[23] *Id.* ¶¶ 41, 49–50.

[24] *Id.* ¶ 51.

approximately $40.75 million, which adjusted the purchase price downwards approximately $11.25 million in the Buyer's favor.[25]

After closing, the Buyer began preparing the Subject Balance Sheet, as required by Section 3.4(a). Upon calculating the Tangible Net Worth, the Buyer discovered that the Company had been taking "a very different approach to ASC 606 than the one Golden Rule believed was outlined under GAAP."[26] A Company employee later confirmed to the Buyer that the Company had implemented ASC 606 incorrectly in its pre-closing financial statements.[27]

Applying ASC 606 in the way that the Company had applied it prior to closing, the Buyer calculated the Company's Tangible Net Worth at approximately $35 million, slightly below the Seller's Estimated Tangible Net Worth of $40.75 million.[28] Applying ASC 606 pursuant to the Buyer's understanding of GAAP, however, the Buyer calculated the Tangible Net Worth to be $73.7 million—an increase of more than $38 million.[29] For its Subject Balance Sheet calculation, the Buyer used the same approach to ASC 606 that the Seller had used before closing.[30]

---

[25] Compl. ¶ 55.

[26] *Id.* ¶ 56.

[27] *Id.* ¶ 57.

[28] *Id.* ¶ 58.

[29] *Id.* ¶ 58.

[30] *Id.* ¶ 59.

Still, on November 27, 2019, when the Buyer delivered the Final Adjustment Statement and Subject Balance Sheet to the Seller, the Buyer also included a "Reconciliation Statement" informing the Seller what the Tangible Net Worth would have been if the Buyer had used the "correct" approach to ASC 606 instead of the "consistent" approach.[31]

On January 7, 2020, the Seller rejected the Final Adjustment Statement and sent a notice triggering the dispute resolution procedures under Section 3.4.[32] The Seller claimed that the Agreement required the Buyer to use the "correct" approach to ASC 606, which should result in the higher Tangible Net Worth and an additional amount of approximately $38 million due the Seller.[33] The parties continued to disagree, and the Seller eventually engaged KPMG as the independent accounting firm to determine the Final Adjustment Amount and resolve the $38 million dispute over the application of ASC 606.[34]

On May 18, 2020, the Buyer filed the Complaint, seeking a declaration and injunction that would prohibit the Seller from asking KPMG to determine the Final Adjustment Amount using an application of ASC 606 that is different from or inconsistent with the application of ASC 606 that the Company used in its pre-

---

[31] *Id.* ¶ 60.

[32] *Id.* ¶ 63.

[33] *Id.* ¶ 65 & Ex. C.

[34] Compl. ¶ 72.

11

closing financial statements.[35]  The Buyer alleges that the court, and not KPMG, should decide the question of contract construction regarding the application of ASC 606 required under the Agreement.[36]  The Seller has not disputed the court's jurisdiction to answer this legal question.

On July 1, 2020, the Seller filed a motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6).  The court held oral argument on October 9, 2020, and the parties submitted supplemental briefing on October 30, 2020.

## II.    ANALYSIS

The Complaint contains three counts.  Count I is a claim for breach of contract. Count II is a claim for breach of the implied covenant of good faith and fair dealing. Count III is a claim based on quasi-estoppel.

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

---

[35] Compl., Prayer for Relief ¶¶ 1–4.

[36] Compl. ¶¶ 73–78.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted); *accord Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

## A. Breach of Contract

Count I alleges that the Seller's demand to calculate the Final Adjustment Amount using a different approach to ASC 606 than the one the Seller used to calculate the Estimated Balance Sheet and 2019 Interim Financial Statements violates the terms of the Agreement.

"[Delaware] courts interpreting a contract 'will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'" *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)). The court must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010). Courts must also "interpret clear and unambiguous terms according to their ordinary meaning." *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 335 (Del. 2012). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different

13

interpretations or may have two or more different meanings." *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

**1.     The Agreement Unambiguously Requires the Application of ASC 606 to the Closing Balance Sheets.**

The unambiguous language of the Agreement requires the final purchase price adjustment to reflect the application of ASC 606. This requirement is found throughout the Agreement, by repeated invocation of the Accounting Principles. The Tangible Net Worth is defined as being prepared "in accordance with the Accounting Principles."[37] The Buyer's post-closing financial statements were to be prepared "in accordance with the Accounting Principles, consistently applied."[38] KPMG's revisions to the final financial statements must "be prepared in accordance with the Accounting Principles."[39] Even the Accounting Principles themselves state that the Final Balance Sheet and Tangible Net Worth calculations "shall be prepared in accordance with the hierarchy outlined [therein.]"[40] That hierarchy, in turn, unambiguously requires the application of ASC 606. Specifically, it states that "[t]he Closing Balance Sheet and Tangible Net Worth will reflect the impact of the

---

[37] Agreement § 1.1.

[38] *Id.* § 3.4(b).

[39] *Id.* § 3.5.

[40] Accounting Principles ¶ 1.

14

requirements of [ASC 606]."[41] Thus, the parties can, and must, ask KPMG to apply ASC 606 when determining the final purchase price adjustment.

Recognizing this inevitable conclusion, the Buyer argues that the approach to ASC 606 that it seeks to have KPMG apply, which is the same approach taken by the Seller in its Estimated Balance Sheet and by the Buyer in its Subject Balance Sheet, still counts as "applying" ASC 606. Pl. Ans. Br. at 31 ("Golden Rule *did apply* ASC 606 in its Closing Balance Sheet and Tangible Net Worth calculations— the same way that the Seller had uniformly applied it before closing.") (emphasis in original). The Buyer's argument is not persuasive. The Buyer repeatedly concedes that the approach to ASC 606 that it seeks to have implemented is the incorrect approach. *E.g.,* Compl. ¶¶ 7–9 (opposing "an inconsistent, corrected ASC 606 calculation"); Compl. ¶¶ 56–59 ("A Company employee confirmed to Golden Rule that the Company had implemented ASC 606 incorrectly."); Compl. Ex. B at 5 ("[The Company's leaders] have validated that the statements used at and prior to close incorrectly accounted for ASC 606. These findings have been confirmed by [the Buyer's accountants], as well as BDO, the Company's auditor."); Pl. Ans. Br. 29 ("[Golden Rule applied ASC 606] in the exact same way that the Seller did before closing, not the way Golden Rule thought GAAP required."); Oral Arg. 34 (Court:

---

[41] *Id.* ¶ 5.

15

"Did the Seller's application of 606 reflect the requirements of 606 under GAAP?" Counsel for the Buyer: ". . . We've said we think that they misapplied it."); Pl. Supp. Br. 3 ("[T]he Company appears not to have applied [ASC] 606 to future estimated revenues and associated expenses arising from certain Company marketing agreements. the Buyer thus prepared a Reconciliation Statement . . . that showed how correctly applying [ASC] 606 would have changed the Company's balance sheet.").

The Agreement, however, requires ASC 606 to be applied *correctly*. This result is compelled by the plain meaning of the phrase requiring the calculation of Tangible Net Worth to "reflect the impact of the requirements of [ASC 606]."[42] The parties did not need to add language to the Accounting Principles requiring an "accurate" or "correct" reflection of the requirements of ASC 606. Those qualifiers, if they can be considered as such, are inherent in the ordinary and usual meaning of the provision.

By arguing that a misapplication of ASC 606 must be used in the Subject Balance Sheet and the Final Balance Sheet, the Buyer is requesting this court to compel a concededly incorrect implementation of ASC 606 as a contractually agreed-upon implementation of ASC 606. The Agreement does not permit such a

---

[42] Accounting Principles ¶ 5.

deviation from its terms. The Buyer urges a construction that is contrary to the plain meaning of the contract and, thus, contrary to what the parties intended.

Admittedly, this dispute involves accounting principles, which do not always lend themselves to black-and-white conclusions about correct application. "GAAP allows for a variety of treatments and different accountants may come to differing views on what constitutes acceptable GAAP treatment." *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 929 (Del. 2017); *see also Alliant Techsystems, Inc. v. MidOcean Bushnell Hldgs., L.P.*, 2015 WL 1897659, at *8 (Del. Ch. Apr. 24, 2015) ("GAAP 'tolerate[s] a range of "reasonable" treatments, leaving the choice among alternatives to management.'" (quoting *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979)). In this case, however, the Buyer is not advocating an approach to ASC 606 that is acceptable under GAAP. The Buyer concedes that its chosen approach is inconsistent with ASC 606.

For these reasons, a straightforward application of the unambiguous Accounting Principles favors the Seller's position, rather than the Buyer's.

### 2. The Phrase "Consistently Applied" Does Not Change the Requirement that ASC 606 Be Correctly Applied to the Closing Balance Sheets.

The Buyer's primary textual argument is centered on the provision in Section 3.4(b) that the Subject Balance Sheet must be "prepared in accordance with the Accounting Principles, *consistently applied*." Agreement § 3.4(b) (emphasis added).

17

The Buyer argues that the phrase "consistently applied" modifies the Accounting Principles' requirements, so that the Accounting Principles need only be applied to the Subject Balance Sheet in the same manner that they were applied to the Company's pre-closing financial statements. In other words, the Buyer argues that it must apply the "consistent" approach to ASC 606 even if that is not the "correct" approach. Compl. ¶¶ 83–84; *see also* Oral Arg. at 33–34 ("[It] doesn't matter for purposes of this case whether our accountant is right or their accountant is right. What matters is that 606 was applied . . . and applied in the same way.")

The Buyer's construction of the Agreement is not reasonable because it would eliminate the ASC 606 requirement from the Accounting Principles. "Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd,* 945 A.2d 594 (Del. 2008). The Buyer's interpretation of "consistently applied" would render meaningless the Agreement's requirement that the Tangible Net Worth calculation in the Subject Balance Sheet must reflect the requirements of ASC 606. The Subject Balance Sheet would be effectively governed by the accounting standards used in the Estimated Balance Sheet instead of the accounting standards specified in the Accounting Principles.

This is contrary to the plain language of the Accounting Principles. The Accounting Principles provide that "[t]he Closing Balance Sheets [*i.e.*, the Estimated Balance Sheet, Subject Balance Sheet, and Final Balance Sheet] . . . and Tangible Net Worth shall be prepared and calculated with the hierarchy outlined below."[43] The very first tier of the hierarchy requires that "[t]he Closing Balance Sheets and Tangible Net Worth will reflect the impact of the requirements of [ASC 606]."[44] Implementation of ASC 606 took precedence over every other accounting methodology, including the methodology that the Company had previously used to prepare its audited financial statements. There is no exception or ambiguity in the Agreement's provisions. The Accounting Principles leave no room for the Buyer's interpretation that, under certain circumstances, a Closing Balance Sheet does not have to implement ASC 606.

The phrase "consistently applied" in Section 3.4(b) does not impliedly create a caveat to the Accounting Principles. "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). The phrase "consistently applied" is generally applied to the Accounting Principles, as a whole. ASC 606, on the other

---

[43] Accounting Principles ¶ 1.

[44] *Id.* ¶ 5.

19

hand, is listed in the Accounting Principles as a "Specific Policy." It is the only accounting standard specifically identified in the Agreement. It was a specific point of negotiation between the parties. It was uniquely prioritized above all other general accounting standards. The general provision that accounting standards should be "consistently applied" does not override the parties' specific inclusion of ASC 606 in the Agreement.

The Buyer's reading of the phrase focuses on "consistently" but ignores "applied." An accounting standard must be applied before it can be applied consistently. In this case, ASC 606 was, as the Buyer concedes, not correctly applied to the Estimated Balance Sheet. Using an equally unacceptable implementation of ASC 606 in the Subject Balance Sheet might achieve consistency, but it would result in ASC 606 being left unapplied to the Subject Balance Sheet. Although the Accounting Principles do not preclude the exercise of reasonable discretion in applying ASC 606, the express language does not leave room for the parties to fail to apply ASC 606. For these reasons, the phrase "consistently applied" does not alter the Agreement's requirement that ASC 606 be correctly reflected in the Closing Balance Sheets.

### 3. *Chicago Bridge* Does Not Compel Departing from the Plain Language of the Agreement.

The Buyer argues that the Delaware Supreme Court's holding in *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912 (Del.

2017), compels application of a "consistent" approach to ASC 606, even if it is an incorrect one. Impliedly acknowledging the weakness of its textual arguments, the Buyer invokes what it considers to be "*Chicago Bridge*'s warning against interpreting the language of contract provisions—particularly those involving a true-up process—entirely divorced from their context and purpose." Pl. Ans. Br. 4.

In *Chicago Bridge*, the Supreme Court observed that "[t]he basic business relationship between parties must be understood to give sensible life to any contract." *Chicago Bridge*, 166 A.3d at 927. The Supreme Court took pains to place into context the "extensive collaboration and complicated commercial relationship" between Westinghouse Electric Company ("Westinghouse") and Chicago Bridge & Iron Company N.V. ("Chicago Bridge"). *Id*. at 914. Westinghouse and CB&I Stone & Webster, Inc. ("Stone") had a multi-year relationship in the construction and design of nuclear power plants. In 2008, Westinghouse and Stone were hired as part of a consortium to build two new nuclear power plants. Chicago Bridge acquired Stone in 2013. Cost overruns and delays resulted in disagreements between Westinghouse and Chicago Bridge, and they decided to disentangle by having Westinghouse acquire Stone, with Chicago Bridge essentially ridding itself of the nuclear business and the attendant liabilities and spiraling costs. *Id*. at 915.

Their acquisition agreement included a purchase price adjustment process, similar to the one in the Agreement here, based on a target working capital amount

21

of $1.174 billion. Three days before closing, Chicago Bridge delivered the pre-closing financial statement, including its determination that the working capital amount was approximately $428 million above the target. A few months later, Westinghouse delivered the post-closing financial statement, in which it calculated that the working capital amount was over $2 billion *below* the target. Almost all of the difference was due to what Westinghouse considered to be Chicago Bridge's incorrect application of GAAP in Stone's financial statements. The parties initiated the purchase price adjustment's dispute resolution procedures. Westinghouse sought to have the independent auditor confirm that, based the working capital amount calculated using a correct application of GAAP, Chicago Bridge owed it $2 billion. Chicago Bridge sought a judicial order to prevent Westinghouse from making arguments regarding historical GAAP compliance to the independent auditor.

The Delaware Supreme Court sided with Chicago Bridge and enjoined Westinghouse from seeking a purchase price adjustment based on GAAP non-compliance. The Court began by noting that "courts must read the specific provisions of the contract in light of the entire contract. That is true in all commercial contexts, but especially so when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business." *Id.* at 913–14. The court then

22

discussed several unique aspects of the transaction that, viewed in light of the parties' extensive and complicated relationship, informed the Court's result.

One contextual factor was the purchase price adjustment's importance to the whole transaction. The parties had agreed to a base purchase price of $0, so any exchange of payment was based solely on the purchase price adjustment. Theirs was not a small-dollar deal, though; the parties pegged the target working capital amount at $1.174 billion, meaning that fluctuations in working capital would be correspondingly large. By contrast, the Agreement here set the Tangible Net Worth Minimum at $52 million, and the amount in dispute between the Buyer and the Seller, large as it is, barely exceeds 5% of the base purchase price.

The Supreme Court in *Chicago Bridge* also focused on the existence of a liability bar in the agreement, which, upon closing, eliminated Chicago Bridge's liability to Westinghouse for breaches of representations and warranties. When Westinghouse sought to challenge the GAAP compliance of Stone's pre-closing financial statements as part of the post-closing purchase price adjustment, the Court characterized this as an attempt to "resuscitate claims covered by the Liability Bar," which the Court rejected. *Id.* at 933.[45] By contrast, the Agreement here contains no

---

[45] *See also Chicago Bridge*, 166 A.3d at 932 ("That the Purchase Agreement's plain meaning does not allow claims that could have been brought as breaches of representations and warranties to be brought as part of the True Up is also apparent because to allow such claims would largely render the Liability Bar meaningless.").

such limitation on liability. The Buyer can resort to indemnification and sue for a breach of representations and warranties as an alternative to seeking a favorable accounting determination from KPMG.[46]

In challenging Chicago Bridge's calculation of the final purchase price, Westinghouse asserted Chicago Bridge had not properly accounted for large claims it had against Westinghouse, "claims that Westinghouse obviously knew about and that were among the reasons principally motivating the transaction." *Id*. at 915. Under the terms of the transaction, Chicago Bridge received zero at closing, subject to the post-closing true-up and the potential for deferred compensation. In addition, Chicago Bridge spent nearly $1 billion on the nuclear projects between signing and closing. At the true-up, Westinghouse then demanded Chicago Bridge to pay Westinghouse nearly $2 billion. The Supreme Court essentially concluded that Westinghouse interpreted the true-up as "providing Westinghouse with a wide-ranging, uncabined right to challenge any accounting principle used by Chicago Bridge, however consistent that principle was with the ones used in the financial statements represented to be GAAP compliant . . . ." *Id*. at 916. That is not this case and not this contract. *See In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017

---

[46] Compl. ¶ 80 (acknowledging that "the Agreement permits Golden Rule to pursue claims for indemnification," even though there is a $7.5 million deductible for certain claims); Agreement §§ 9.2, 9.3.

WL 782495, at *10 (Del. Ch. Feb. 28, 2017) ("[E]ach specific agreement must be interpreted in accordance with its own terms.").[47]

The parties here bargained for the application of a specific accounting principle in calculating the true-up payment. That principle was not required in order for the Company's financial statements to be compliant under GAAP because the Company was private. Instead, the implementation of ASC 606 was a separate, bargained-for term that does not provide a party with "a wide-ranging, uncabined right to challenge any accounting principle." Nor is the application of the parties' bargained-for contract anything close to the eye-popping result that seemed to trouble the Supreme Court in *Chicago Bridge*.

The Supreme Court emphasized that the parties' purchase price adjustment "has an important role to play, but that role is limited and informed by its function in the overall Purchase Agreement." *Chicago Bridge*, 166 A.3d at 928. With that in mind, the court discussed the usual function of a purchase price adjustment. "[P]urchase price adjustments in merger agreements account for changes in a target's business between the signing and closing of the merger." *Id.* at 928. The

---

[47] *See also Alliant Techsystems, Inc. v. MidOcean Bushnell Hldgs., L.P.*, 2015 WL 1897659, at *1 (Del. Ch. Apr. 24, 2015) ("This Court and courts in other jurisdictions have reached different results in determining whether a dispute over accounting methodology may be resolved as part of a purchase price adjustment process. This is not surprising. Claims of this nature are creatures of contract and counterparties to a transaction are free to contractually order their affairs as they wish.").

court noted that purchase price adjustments generally depend on consistency of computations for their usual function. "[I]t would be awfully difficult for the [purchase price adjustment] to fulfill one of its main roles, i.e., account for changes in Stone's business between signing and closing, if one accounting approach was used to complete the Financial Statements for signing and another one was used to complete the [purchase price adjustment] calculations." *Id.* at 930.[48]

Contrary to the Buyer's assertion, however, the Supreme Court in *Chicago Bridge* did not reach its conclusion based solely on the context and purpose of a purchase price adjustment. Rather, it found that "[t]he plain terms of the definition of Net Working Capital, read in conjunction with the rest of Purchase Agreement, require the use of Stone's past accounting practices, rather than a new assessment of those historical practices' compliance with GAAP." *Id.* at 928.

In *Chicago Bridge*, the agreement's "Agreed Principles" defined "Working Capital" as the following:

> Working Capital . . . will be determined in a manner consistent with GAAP, consistently applied by [Stone] in preparation of the financial statements of the Business, as in effect on the Closing Date. To the extent not inconsistent with the foregoing, Working Capital . . . shall be based on the past practices and accounting principles, methodologies and policies applied by [the company] and its subsidiaries and the Business (a) in the Ordinary Course of Business and (b) in the preparation of: (i) the balance sheet of the [the company] and its

---

[48] *See also Chicago Bridge*, 166 A.3d at 929 ("[K]eeping all other variables constant in terms of accounting is crucial.").

Subsidiaries for the year ended December 31, 2014 (adjusted to reflect the Business); and (ii) the Sample Calculation [as provided at signing].

*Id.* at 922 (emphasis omitted). The pre-closing statement was to be "prepared and determined from the books and records of the Company and its Subsidiaries and in accordance with [GAAP] applied on a consistent basis throughout the periods indicated and with the Agreed Principles," including their definition of Working Capital. *Id.* (emphasis omitted). Similarly, the post-closing statement was to be "prepared and determined from the books and records of the Company and its Subsidiaries and in accordance with [GAAP] applied on a consistent basis throughout the periods indicated and with the Agreed Principles," again including the definition of Working Capital. *Id.* at 923 (emphasis omitted).

The Supreme Court concluded that the contract provisions pertaining to the pre-closing financial statement, the post-closing financial statement, and the applicable accounting principles in *Chicago Bridge* plainly required working capital calculations to be consistent with past practices. A similar conclusion cannot be drawn from the plain language of the Agreement here, particularly with respect to the application of ASC 606 to the Tangible Net Worth calculations. The Agreement simply states that "Tangible Net Worth will reflect the impact of the requirements of [ASC 606]."[49] It does not require application of ASC 606 to be consistent with

_____

[49] Accounting Principles ¶ 5.

27

its application in the Company's past financial statements, or in the 2019 Interim Financial Statements, or in the Estimated Balance Sheet. It demands compliance, not consistency.

As discussed above, the Agreement's directive that the Subject Balance Sheet should be prepared in accordance with the Accounting Principles, "consistently applied,"[50] does not alter or supersede the requirement in the Accounting Principles that ASC 606 must be correctly applied. The two-word phrase, repeated only once throughout these provisions, is not a strong showing that the parties intended temporal consistency to take precedence over actual compliance with ASC 606. It also does not outweigh the forceful evidence to the contrary. For example, the parties alluded to temporal consistency in paragraph 1(b) the Accounting Principles, when they agreed that the Closing Balance Sheets should be prepared in accordance with the accounting policies used to prepare the Company's 2018 audited annual balance sheet.[51] But the parties specifically carved out paragraph 1(a)'s application of ASC 606 from this consistency requirement, by stating that paragraph 1(b) only applied "to the extent not addressed in paragraph (a)" and that "paragraph (a) shall take precedence over paragraph[] (b)."[52]

---

[50] Agreement § 3.4(b).

[51] Accounting Principles ¶ 1(b).

[52] *Id.* ¶ 1.

28

Relatedly, there is a difference in the structure of the Agreement that militates against importing the contextual reasoning from *Chicago Bridge*. In *Chicago Bridge*, the parties specifically contracted for consistency across the whole purchase price adjustment process. At signing, Chicago Bridge represented that Stone's financial statements, on which the parties based their target working capital amount, had "been prepared in accordance with GAAP." *Chicago Bridge*, 166 A.3d at 929. The parties then agreed that the working capital amount calculated by both parties during the true-up process would be determined on the basis of "GAAP, consistently applied by [Stone] in preparation of the financial statements of the Business." *Id.* at 922. Thus, in construing that specific agreement, the Supreme Court concluded that the parties intended for the same accounting standards to be used to calculate working capital when setting the target amount at signing and when determining the actual amount at closing.

By contrast, the Buyer and the Seller did not agree to such consistency. According to the Buyer, it relied on the Company's prior financial statements, including the 2019 Interim Financial Statements, to set the Tangible Net Worth Minimum at signing.[53] In the Agreement, the Company represented that those financial statements "were prepared in accordance with GAAP, consistently

---

[53] Compl. ¶ 26.

29

applied."[54] The Buyer knew that, because the Company was a private company, GAAP compliance did not require implementing ASC 606 in those financial statements. The Company did not represent in the Agreement that any of its financial statements, which formed the basis for determining the Tangible Net Worth Minimum at signing, had implemented ASC 606. When it came to calculating the Tangible Net Worth at closing, however, the parties specifically agreed to implement ASC 606.[55] Thus, the plain language of the Agreement reflects that the parties agreed to use one accounting standard to determine the Tangible Net Worth Minimum at signing (GAAP without ASC 606) and a different accounting standard to calculate Tangible Net Worth at closing (GAAP with ASC 606). It is not the role of this court to second-guess the parties and read into their agreement what they have omitted. "'It is . . . axiomatic that a court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions.'" *Renco Grp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2013 WL 3369318, at *5 (Del. Ch. June 19, 2013) (quoting *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969)).

---

[54] Agreement § 4.5(a).

[55] The Accounting Principles, which require the parties to calculate the Closing Balance Sheets and the Tangible Net Worth in accordance with ASC 606, are only referred to in the Agreement's sections on calculating the post-closing adjustment and in the definition of financial measurements that are to be determined "as of the Adjustment Time [i.e., 11:59 p.m. on the day before the Closing Date]." Agreement §§ 1.1, 3.1, 3.4, 3.5.

30

As the Supreme Court noted about the agreement in *Chicago Bridge*, "[t]he True Up provision of the Purchase Agreement is consistent with the general role net working capital adjustments play." *Chicago Bridge*, 166 A.3d at 928. The agreement in *Chicago Bridge* lent itself to being interpreted as demanding consistency across all relevant time frames. The Agreement here does not.[56]

This conclusion is consistent with other cases where accounting disputes arose during a true-up process. In *OSI Systems, Inc. v. Instrumentarium Corp.*, 892 A.2d 1086 (Del. Ch. 2006), the parties' agreement required the buyer's post-closing calculation of working capital to be "prepared in accordance with the Transaction Accounting Principles applied consistently with their application in connection with the preparation" of the financial statement that informed the working capital target established at signing and the financial statement that the seller had delivered just prior to closing. *Id.* at 1091. The agreement further provided that "'Transaction Accounting Principles' . . . means U.S. GAAP, provided, however that . . . with respect to any matter as to which there is more than one principle of U.S. GAAP, Transaction Accounting Principles means the principles of U.S. GAAP applied in

---

[56] *See Alliant Techsystems, Inc. v. MidOcean Bushnell Hldgs., L.P.*, 2015 WL 1897659, at *9 (Del. Ch. Apr. 24, 2015) ("[Determining whether calculations are correct based only on the accounting principles implemented by a seller in preparing financial statements] would be a commercially sensible and logical way for a buyer and seller to structure a stock purchase transaction. The difficulty for [the seller], however, is that is not what the parties here agreed to do.").

preparation of the [prior] Financial Statements." *Id.* The court concluded that, while the buyer could assert non-compliance with GAAP in a claim for indemnification, it could not do so in the purchase price agreement's dispute resolution procedure, because the purchase price adjustment required the accounting principles to be consistent rather than strictly complaint.

The New York Court of Appeals reached the same conclusion in *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667 (N.Y. 2003). In *Westmoreland*, the seller represented and warranted that the company's interim financial statements "were prepared in accordance with GAAP." *Id.* at 668. The parties then established a target net asset value based on the interim financial statements. The purchase price adjustment provisions required the seller to prepare a closing financial statement pursuant to the following guidance: "The accounting will be in accordance with GAAP applied on a consistent basis with past practices used by [the company] to determine appropriate accruals. The accounting principles shall be consistent with the principles used to prepare the financial statements disclosed in Section 2.08(a) [which included the interim financial statements]." *Id.* at 670–71. The court concluded that the parties' agreement required consistent accounting standards to be used across each financial statement in the purchase price adjustment, such that compliance with GAAP was not a proper dispute under the agreement's purchase price adjustment provisions.

In both *OSI* and *Westmoreland*, the court examined the parties' agreement and concluded that the parties intended consistency, rather than compliance, to be the principal factor for resolving a dispute over a purchase price adjustment. In each case, as in *Chicago Bridge*, the parties were held to have expressly agreed to apply the relevant accounting standards consistently with their application in previous financial statements. In each case, the parties also agreed to use the same accounting standards at all relevant timeframes of the purchase price adjustment, without inclusion of any specific accounting standard that should take precedence over past accounting practices. By contrast, the Buyer and the Seller expressly agreed that the Closing Balance Sheets must reflect the requirements of ASC 606, without reference to other financial statements and without regard to past accounting practices.

This case is closer to *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, 2015 WL 1897659 (Del. Ch. Apr. 24, 2015). In *Alliant*, as in *Chicago Bridge*, *OSI*, and *Westmoreland*, the buyer sought to challenge the seller's compliance with GAAP as part of a purchase price adjustment's dispute resolution procedures. The financial metric at issue was the net working capital, which the agreement required to be "calculated in accordance with GAAP and otherwise in a manner consistent with the practices and methodologies used in preparation of the Financial Statements referenced in Section 3.4(a)(i) [which included the statements from which the target working capital amount was derived]." *Id.* at \*7; *see also id.*

33

at *6 n.51. The court construed the provision as having two separate requirements: the calculation of net working capital had to comply with GAAP *and* be consistent with past practices.

> To construe Section 2.4 otherwise and require [the buyer] to calculate Net Working Capital in the same manner [the company] had done historically, *even if that methodology did not comply with GAAP,* would be to read the words "calculated in accordance with GAAP" out of the definition of Net Working Capital . . . . Had the parties intended to proscribe [the buyer] from challenging whether [the seller's] estimate of Net Working Capital was based on calculations compliant with GAAP as part of the Purchase Price Adjustment Procedure, they logically would have defined the method of calculating Net Working Capital for purposes of Section 2.4 to require the application of the same accounting methodologies [the company] had used historically in preparing its financial statements—period— without additionally requiring that those calculations be made in accordance with GAAP.

*Id*. at *8 (emphasis in original). The court permitted the buyer to challenge GAAP compliance as part of the purchase price adjustment because the parties had not intended consistency with past practices to take precedence over compliance with GAAP.

The Agreement in this case likewise establishes the two separate requirements of compliance and consistency. The Accounting Principles require that the Closing Balance Sheets and Tangible Net Worth "reflect the impact of the requirements of [ASC 606]" (in tier (a)) *and* otherwise be calculated in accordance with the Company's past accounting policies (in tier (b)). As in *Alliant*, allowing the Subject Balance Sheet to be calculated using the implementation of ASC 606 that was used

34

in the Estimated Balance Sheet, even if that implementation was wrong, would result in the Subject Balance Sheet not reflecting the requirements of ASC 606 and thus would read the ASC 606 requirement out of the Agreement. Under the language of the Agreement, consistency with past practices cannot justify a concededly incorrect application of ASC 606.

For the foregoing reasons, the Agreement does not prohibit the Seller from demanding that the Final Adjustment Amount be calculated using an approach to ASC 606 that may be different than the approach the Seller previously used. The Buyer's claim for breach of contract must be dismissed.

## B. Breach of Implied Covenant of Good Faith and Fair Dealing

In Count II, the Buyer seeks a declaration, under the implied covenant of good faith and fair dealing, that the Seller may not ask KPMG to award a Final Adjustment Amount that relies on an application of ASC 606 that is different from the application of ASC 606 that the Company used and disclosed to the Buyer before closing.

"The implied covenant of good faith is a 'cautious enterprise' that 'is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions.'" *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 506–07 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del.

2010), and *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)). "[T]he implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." *Oxbow*, 202 A.3d at 507 (internal quotations omitted). "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Dunlap*, 878 A.2d at 441. The court must "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126.

The Buyer argues that the Seller has violated the implied covenant by applying ASC 606 with one approach in the 2019 Interim Financial Statements and in the Estimated Balance Sheet but then demanding that a different approach to ASC 606 be applied to the Final Balance Sheet and Final Adjustment Amount. According to the Buyer, the Seller's actions run contrary to what the parties intended and expected when they inserted a true-up process into the Agreement. The Buyer also argues that it could not have anticipated the Seller flip-flopping on how ASC 606 should be applied.

The Buyer's arguments fail because the conduct at issue does not fall into any gap in the Agreement. The Agreement is not silent on what accounting standards should be applied to the Final Balance Sheet. The Accounting Principles state that the Closing Balance Sheets will reflect the impact of the requirements of ASC 606,

36

regardless of how it was previously implemented. The Seller is authorized to ask KPMG to apply ASC 606 correctly, and doing so is not a breach of the implied covenant.

The Agreement is also not silent on how the Company must have previously prepared its financial statements. The Company represented that its historical financial statements, including its 2019 Interim Financial Statements, were prepared in accordance with GAAP, consistently applied.[57] The parties understood that compliance with GAAP did not require the Company to implement ASC 606 in those financial statements.[58] For that reason, the parties specifically added ASC 606 to the Accounting Principles that were applicable to the Closing Balance Sheets. The parties did not, however, require the Company to represent that its previous financial statements implemented ASC 606, nor did they require that the Accounting Principles apply to the Company's 2019 Interim Financial Statements. "[A]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" *Oxbow*, 202 A.3d at 507 (citing *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 897 (Del. 2015)).

---

[57] Agreement § 4.5.

[58] Compl. ¶¶ 37–38; Compl. Ex. C at 2; Pl. Ans. Br. at 11.

Because the Agreement addresses the conduct at issue, the Buyer has failed to state a claim for breach of the implied covenant of good faith and fair dealing.

## C. Quasi-Estoppel

In Count III, the Buyer argues that the doctrine of quasi-estoppel precludes the Seller from asking KPMG to determine a Final Adjustment Amount based on any implementation of ASC 606 that is different from the implementation that the Company applied to its pre-closing financial statements.

Under Delaware law, the doctrine of quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another." *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008), *aff'd,* 970 A.2d 256 (Del. 2009). "The standard remains high" for invoking the doctrine of quasi-estoppel. *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *35 (Del. Ch. Mar. 30, 2017).

This high standard is apparent from the fact that the parties have only cited one case where this court found that all of the elements of quasi-estoppel were satisfied, and the court in that case did so as an alternative holding. *Pers. Decisions,* 2008 WL 1932404, at *6–7. In *Personnel Decisions*, the defendant sent a notice of

arbitration to the plaintiff, invoking provisions of the Delaware Uniform Arbitration Act ("DUAA") that, according to the defendant, required the plaintiff to respond within twenty days. Four years later, after the defendant formally initiated arbitration, the plaintiff brought an action in this court, seeking to enjoin the arbitration pursuant to other DUAA provisions. From the notice of arbitration in 2003 until the conclusion of briefing in early 2008, the parties worked under the assumption that the DUAA applied to the claims. Once the court raised the question of whether the parties' contract should instead be governed by the Federal Arbitration Act ("FAA"), however, the defendant argued that the FAA controlled and that the case should be dismissed for lack of subject matter jurisdiction. The court concluded that the parties' course of performance demonstrated that they intended to apply the DUAA. The court alternatively rejected the defendant's argument on the basis of quasi-estoppel, finding that it would be unconscionable to allow the defendant to make a "graceless," "self-interested 180[-]degree turn" so late in the litigation. *Id.* at *7.

This case does not present such compelling circumstances. According to the Buyer, the Seller initially took the position in the 2019 Interim Financial Statements and in the Estimated Balance Sheet that ASC 606 should be applied in one particular way, but now the Seller is taking the inconsistent position that ASC 606 should be applied in a different way for the Final Balance Sheet. The Buyer also alleges that

39

the Seller obtained a benefit from its application of ASC 606 in that it "induced Golden Rule to sign the Agreement and close the Transaction."[59] Even if the Seller received a benefit from its first position and then switched to an inconsistent stance, however, the Buyer has failed to show that the Seller's conduct is unconscionable.

As discussed above, the Agreement requires the Final Adjustment Amount to reflect a proper application of ASC 606, regardless of the Company's past accounting practices. By asking KPMG to apply ASC 606 properly, the Seller is seeking to comply with and enforce the express terms of the parties' Agreement, as opposed to taking a new, inconsistent stance solely to advance an argument in litigation. "[A] decision to stand on the bargained-for language of the contracts does not shock the conscience. . . . Enforcing the contracts as written here would not offend equitable principles." *Simon-Mills II,* 2017 WL 1191061, at *35.

Furthermore, "courts are particularly reluctant to find unconscionability in contracts between sophisticated corporations." *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119, 2014 WL 823407, at *7 (Del. 2014) (TABLE). The Buyer argues that sophistication of the parties is irrelevant because quasi-estoppel depends on the unconscionability of the results of the Seller's conduct, rather than the unconscionability of the Agreement itself. In this case, however, the contract

---

[59] Compl. ¶ 102.

and the allegedly unconscionable conduct are sufficiently intertwined. The Company made over thirty pages of representations, warranties, and covenants in the Agreement. Moreover, the Agreement specifically addressed the Company's accounting standards used before signing and the accounting standards to be used in the true-up process. The parties could have easily chosen to include language to limit or proscribe the conduct that the Buyer now complains of. "[A] sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction [makes] it impossible to prove justifiable reliance and . . . this behavior indicate[s] that the sophisticated party made a business decision, which the court [will] not second-guess." *Id.* at *9 n.64 (summarizing *Debakey Corp. v. Raytheon Serv. Co.*, 2000 WL 1273317, at *26–28 (Del. Ch. Aug. 25, 2000)).

For these reasons, the Buyer's argument fails to meet the high standard for a claim of quasi-estoppel. Accordingly, Count III is dismissed for failure to state a claim upon which relief can be granted.

## III. CONCLUSION

For the foregoing reasons, the Seller's motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6) is granted.

**IT IS SO ORDERED.**

41